UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| Ogilvie Brands, Inc. d/b/a Love Wellness, | |
| Plaintiff, | Case No. 1:23-cv-4932-JHR |
| v. | |
| Love Health, Inc. | |
| Defendant. | |

**DEFENDANT'S MEMORANDUM OF LAW IN OPPOSITION TO
PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**

## **TABLE OF CONTENTS**

PRELIMINARY STATEMENT ................................................................................................. 1

BACKGROUND ....................................................................................................................... 2

   A.   LHI ................................................................................................................................ 2

   B.   Ogilvie ......................................................................................................................... 3

   C.   "Love" is widely used in marks by third parties in connection with health and beauty-related goods and services ........................................................................................... 4

   D.   Ogilvie sues LHI ......................................................................................................... 5

LEGAL STANDARD FOR IMPOSING A PRELIMINARY INJUNCTION .............................. 5

ARGUMENT ............................................................................................................................ 6

   I.     THE PROPOSED RELIEF FAILS TO COMPLY WITH FED. R. CIV. P. 65(d) .............. 6

   II.   OGILVIE HAS NOT SHOWN A LIKELIHOOD OF SUCCESS ON THE MERITS ....... 7

     a.   Ogilvie Has Not Shown a Likelihood of Success on the Merits of its Lanham Act Claims .......................................................................................................................... 7

       i.   Ogilvie's Marks are Weak and Entitled to Narrow Protection ................................... 7

          1.   Ogilvie's marks are weak because they are in a crowded field of other "Love"-formative marks .............................................................................................. 8

          2.   Ogilvie has not shown that its marks have acquired distinctiveness in the marketplace. ................................................................................................... 11

       ii.   Ogilvie and LHI's Marks Give Markedly Different Commercial Impressions .......... 13

       iii.  Ogilvie and LHI Offer Very Different Goods and Services ..................................... 15

       iv.  Ogilvie Offers No Evidence of Bridging the Gap .................................................... 17

       v.   Ogilvie Admits There is No Actual Confusion ......................................................... 18

       vi.  LHI Adopted its Marks in Good Faith ...................................................................... 18

       vii. The Respective Quality of the Parties' Goods and Services Does Not Favor a Finding of Infringement .................................................................................................... 20

       viii.   Consumers in the Relevant Markets can Tell the Difference ................................ 20

     b.   Ogilvie's State Law Claims Are Unlikely to Succeed ................................................ 21

       i.   General Business Law § 349 .................................................................................... 21

       ii.   General Business Law § 360-l ................................................................................. 22

       iii.  General Business Law § 133 .................................................................................... 22

   III.  OTHER FACTORS WARRANT DENIAL OF INJUNCTIVE RELIEF ......................... 23

     a.   Ogilvie Has Not Demonstrated Irreparable Harm .................................................... 23

     b.   The Balance of Hardships Weighs Heavily in LHI's Favor ........................................ 24

   IV.  IN THE ALTERNATIVE, A SIZABLE BOND IS WARRANTED ................................ 25

CONCLUSION ...................................................................................................................... 25

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Abercrombie & Fitch Co. v. Hunting World, Inc.*,
    537 F.2d 4 (2d Cir. 1976) ...........................................................................................7

*Beech-Nut, Inc. v. Warner-Lambert Co.*,
    346 F. Supp. 547 (S.D.N.Y. 1972), *aff'd*, 480 F.2d 801 (2d Cir. 1973) .................10

*Benihana, Inc. v. Benihana of Tokyo, LLC*,
    784 F.3d 887 (2d Cir. 2015).........................................................................................5

*Blockchain Lux. S.A. v. Paymium*,
    2019 WL 4199902 (S.D.N.Y. Aug. 7, 2019).............................................................21

*Bobcar Media, LLC v. Aardvark Event Logistics*,
    554 F. Supp. 3d 606 (S.D.N.Y. 2021)........................................................................12

*Brennan's, Inc. v. Brennan's Rest., L.L.C.*,
    360 F.3d 125 (2d Cir. 2004)........................................................................................7

*Caliko, SA v. Finn & Emma, LLC*,
    2022 WL 596072 (S.D.N.Y. Feb. 28, 2022)..............................................................22

*Car-Freshner Corp. v. Am. Covers, LLC*,
    980 F.3d 314 (2d Cir. 2020)......................................................................................11

*Christian Louboutin S.A. v. Yves Saint Laurent Am. Holdings, Inc.*,
    696 F.3d 206 (2d Cir. 2012)......................................................................................12

*Citibank, N.A. v. Citytrust*,
    756 F.2d 273 (2d Cir. 1985)......................................................................................23

*City of New York v. Mickalis Pawn Shop, LLC*,
    465 F.3d 114 (2d Cir. 2011).........................................................................................6

*Dana Braun, Inc. v. SML Sport Ltd.*,
    2003 WL 22832265 (S.D.N.Y. Nov. 25, 2003).........................................................10

*Dean v. Debejian*,
    2022 WL 17842983 (N.D.N.Y. Dec. 22, 2022)...........................................................6

*Easy Spirit, LLC v. Skechers U.S.A., Inc.*,
    571 F. Supp. 3d 185 (S.D.N.Y. Nov. 16, 2021).............................................13, 22

*Engine Capital Mgmt., LP v. Engine No. 1 GP LLC*,
    2021 WL 1372658 (S.D.N.Y. Apr. 12, 2021)...........................................................23

*ESPN, Inc. v. Quiksilver, Inc.*,
    586 F. Supp. 2d 219 (S.D.N.Y. 2008).......................................................................22

*Essence Comm'ns, Inc. v. Singh Indus.*,
703 F. Supp. 261 (S.D.N.Y. 1988)......................................................................18

*Excelled Sheepskin & Leather Coat Corp. v. Oregon Brewing Co.*,
897 F.3d 413 (2d Cir. 2018)................................................................................7

*Fed. Express Corp. v. Fed. Espresso, Inc.*,
201 F.3d 168 (2d Cir. 2000)..............................................................................14

*Frank's Rest., Inc. v. Lauramar Enters.*,
711 N.Y.S.2d 433 (2d Dep't 2000).....................................................................23

*Gen. Mills, Inc. v. Kellogg Co.*,
824 F.2d 622 (8th Cir. 1987) ..............................................................................7

*Giggle, Inc. v. netFocal Inc.*,
856 F. Supp. 2d 625 (S.D.N.Y. 2012)...........................................................*passim*

*Howard Opera House Assocs. v. Urban Outfitters, Inc.*,
322 F.3d 125 (2d Cir. 2003)................................................................................6

*Interlink Int'l Fin. Servs., Inc. v. Block*,
145 F. Supp. 2d 312 (S.D.N.Y. 2001).................................................................25

*Ivy Mar Co. v. C.R. Seasons*,
907 F. Supp. 547 (E.D.N.Y. 1995) .....................................................................24

*Jackpocket, Inc. v. Lottomatrix NY LLC*,
2022 WL 17733156 (S.D.N.Y. Dec. 7, 2022) .......................................9, 13, 14, 15

*Kaplan, Inc. v. Yun*,
16 F. Supp. 3d 341 (S.D.N.Y. 2014)...................................................................21

*Lang v. Retirement Living Publ'g Co.*,
949 F.2d 576 (2d Cir.1991)................................................................................10

*Limited v. Macy's Merch. Grp. Inc.*,
2016 WL 4094913 (S.D.N.Y. Aug. 2, 2016), *aff'd sub nom. Joules Ltd. v.
Macy's Merch. Grp., Inc.*, 695 F. App'x 633 (2d Cir. 2017)....................................9

*Louis Vuitton Malletier v. Dooney & Bourke, Inc.*,
454 F.3d 108 (2d Cir. 2006)..............................................................................14

*Medici Classics Prods. LLC v. Medici Grp. LLC*,
590 F. Supp. 2d 548 (S.D.N.Y. 2008)............................................................18, 19

*Mobil Oil Corp. v. Pegasus Petroleum Corp.*,
818 F.2d 254 (2d Cir. 1987)..............................................................................19

*Nabisco, Inc. v. Warner-Lambert Co.*,
220 F.3d 43 (2d Cir. 2000).................................................................................14

*Nat'l Distillers Prods. Co. v. Refreshment Brands, Inc.*,
 198 F. Supp. 2d 474 (S.D.N.Y. 2002) ........................................................................12

*New World Sols., Inc. v. NameMedia Inc.*,
 150 F. Supp. 3d 287 (S.D.N.Y. 2015) .......................................................................22

*Nora Beverages, Inc. v. Perrier Grp. Amer., Inc.*,
 269 F.3d 114 (2d Cir. 2001) ........................................................................................9

*Paddington Corp. v. Attiki Importers & Distribs., Inc.*,
 996 F.2d 577 (2d Cir. 1993) ......................................................................................19

*Perfect Pearl Co. v. Majestic Pearl & Stone, Inc.*,
 887 F. Supp. 2d 519 (S.D.N.Y. 2012) .......................................................................22

*Pfizer v. Sachs*,
 652 F. Supp. 2d 512 (S.D.N.Y. 2009) .......................................................................19

*Playtex Prods. v. Georgia-Pacific Corp.*,
 390 F.3d 158 (2d Cir. 2004) ......................................................................................21

*Plus Prods. v. Plus Disc. Foods, Inc*.,
 722 F.2d 999 (2d Cir. 1983) ......................................................................................10

*Polaroid Corp. v. Polarad Elecs. Corp.*,
 287 F.2d 492 (2d Cir. 1961) ..................................................................................7, 20

*Purgess v. Parauda*,
 2021 WL 2269540 (S.D.N.Y. June 3, 2021) ...............................................................6

*Reply All Corp. v. Gimlet Media, LLC*,
 843 F. App'x 392 (2d Cir. 2021) ...............................................................................18

*RiseandShine Corp. v. PepsiCo, Inc.*,
 41 F.4th 112 (2d Cir. 2022) ...........................................................................9, 10, 13

*Salinger v. Colting*,
 607 F.3d 68 (2d Cir. 2010) ...........................................................................................5

*Savin Corp. v. Savin Grp.*,
 391 F.3d 439 (2d Cir. 2004) ......................................................................................21

*Star Indus. v. Bacardi & Co.*,
 412 F.3d 373 (2d Cir. 2005) ......................................................................................19

*Streetwise Maps v. VanDam, Inc.*,
 159 F.3d 739 (2d Cir. 1998) ......................................................................................10

*Sunenblick v. Harrell*,
 *aff'd* 101 F.3d 684 (2d Cir. 1996) .......................................................................15, 18

iv

*Swanson v. Georgetown Collection*,
   1995 WL 72717 (N.D.N.Y. Feb. 14, 1995) ........................................................15

*Two Hands IP LLC v. Two Hands Am., Inc.*,
   563 F. Supp. 3d 290 (S.D.N.Y. 2021) ...............................................................11

*Union Home Mortg. Corp. v. Cromer*,
   31 F.4th 356 (6th Cir. 2022) ................................................................................6

*Weight Watchers Int'l, Inc. v. Luigino's, Inc.*,
   423 F.3d 137 (2d Cir. 2005)...............................................................................23

*Wizkids/NECA, LLC v. TIII Ventures, LLC*,
   2019 WL 1454666 (S.D.N.Y. Mar. 31, 2019) ......................................7, 13, 20, 21

*Woodstock Ventures, LC v. Woodstock Roots LLC*,
   837 F. App'x 837 (2d Cir. 2001) .........................................................................6

**Statutes**

General Business Law § 133................................................................................22, 23

General Business Law § 349................................................................................21, 22

General Business Law § 360-l....................................................................................22

Lanham Act.........................................................................................7, 18, 21, 22

**Other Authorities**

Contrive Datum Insights, *Health Supplement Market Is Expected to Reach USD
   620.8 Billion by 2030, Grow at a CAGR Of 8.6% during Forecast Period
   2023 to 2030,* https://finance.yahoo.com/news/health-supplement-market-
   expected-reach-040000637.html..........................................................................12

Fed. R. Civ. P. 65 .......................................................................................1, 6, 25

Jon Stojan, *The Ins and Outs of Buying Instagram Followers and Likes*, Miami
   Herald (Feb. 21, 2023), *available at* https://amp.miamiherald.com/contributor-
   content/article272564875.html ............................................................................12

*U.S. Dietary Supplements Market Size, Share & Trends Analysis Report, 2023-30*,
   available at https://www.grandviewresearch.com/industry-analysis/us-dietary-
   supplements-market-report ..................................................................................12

Defendant Love Health, Inc. ("LHI") respectfully submits this Memorandum of Law in opposition to Plaintiff Ogilvie Brands, Inc.'s ("Ogilvie") Motion for a Preliminary Injunction (the "Motion"). This Memorandum is accompanied by the declarations of Ethan Jacobs and Karissa Paddie and exhibits thereto.

## PRELIMINARY STATEMENT

This trademark dispute is Ogilvie's attempt to appropriate for itself a widely used word— "Love"—commonly used in marks by companies in the health and wellness space. LHI, a fledgling start-up, set out to create a healthcare venture with a tripartite vision: an online marketplace for health-conscious consumers, a social media community to allow people to share their healing journeys, and a decentralized infrastructure for underwriting clinical studies. LHI saw an opportunity to acquire the valuable domain name www.love.com, and adopted the marks "LOVE" and "LOVE.COM" to connote feelings of connectedness and trust in contrast to the alienating aspects of our healthcare system.

After learning of LHI's business, Ogilvie—which operates under the separate brand "LOVE WELLNESS" and does not directly compete with LHI—brought this lawsuit in a transparent attempt to prevent LHI from using the word "love," which is the only material similarity between the parties' marks. Ogilvie's Motion is deficient, *inter alia*, because (1) it seeks undisclosed injunctive relief that fails to meet the most basic requirements for a preliminary injunction under Fed. R. Civ. P. 65, and (2) it fails to adduce persuasive evidence that Ogilvie's alleged "LOVE WELLNESS" marks are distinctive or that LHI's use of its own "LOVE" and "LOVE.COM" marks are likely to cause *any* confusion—let alone the level of confusion necessary for a finding of trademark infringement.

Ogilvie's claims rest entirely on the parties' shared use of "love"—a word already being

extensively used by other third parties in connection with wellness goods and services. Aside from the shared use of "love," the parties' marks leave entirely different commercial impressions, and the parties do not even directly compete: Ogilvie uses "LOVE WELLNESS" as a source indicator for its *own* products, but takes issue with LHI's use of "LOVE" in connection with a marketplace selling *third-party* products that do not even bear LHI's marks. Even consumers of modest sophistication can tell the difference, which is shown by the fact that Ogilvie ***admits*** that, to date, no one has been confused. At bottom, Ogilvie cannot demonstrate a likelihood of success on the merits, and so its Motion must fail.

On top of this, because Ogilvie failed to specify any injunctive relief in its Motion, it is impossible to even weigh the other factors required to issue an injunction. Ogilvie cannot demonstrate irreparable harm when it waited over two months to bring this Motion and its own proposed relief does not even address any claimed harm. And the balance of hardships cannot be determined when the proposed relief does not apprise LHI of what conduct Ogilvie seeks to prohibit. Such a vague, indeterminate injunction could pose an existential threat to LHI, an emerging startup just gaining momentum, which has invested substantial capital into building its brand, and is actively continuing to raise necessary capital. For these reasons and the reasons set forth below, LHI respectfully requests that the Motion be denied.

## BACKGROUND

### A.    LHI

Ryan Breslow, who previously founded the multi-billion dollar e-commerce company Bolt, created LHI in 2021 to develop an online marketplace for health-conscious consumers, create a social media community to allow people to share their healing journeys, and decentralize the infrastructure for underwriting clinical studies. Paddie Decl. ¶¶ 3, 6. LHI selected the domain

name www.love.com and adopted the brand name "LOVE" to build around the concept of the word and the notions of connectedness and trustworthiness that the word conveys. *Id.* ¶ 6.

Before exploring a decentralized clinical funding, LHI also explored cryogenics (and applied for trademarks in that field) and other ventures in the medical space. *Id.* ¶ 6. The plan was, and remains in the long term, to establish a marketplace selling products which are funded through LHI's decentralized infrastructure and to create a community for conscious consumers through a social media web-based application. *Id.* LHI sells a few branded products referred to as "swag," to promote its brand—shirts, sweatpants, sweatshirts, and a book—but otherwise, its marketplace is composed of products made by other companies, bearing those other companies' trademarks, and not LHI's marks. *Id.* ¶¶ 9-14. LHI employes a vetting process for each of its marketed goods, which includes compliance evaluation, review of Certificates of Analysis, and product review by industry experts. *Id.* ¶ 17. To fund its ambitious projects, LHI has actively sought funding from investors, and has raised approximately $20 million to date. *Id.* ¶ 7. It plans to raise significantly more in the near term. *Id.*

### B. Ogilvie

Ogilvie was founded in 2016 by former reality television personality Lauren "Lo" Bosworth to offer "female-focused health products and services." Declaration of Lauren Bosworth, ECF No. 18 ("Bosworth Decl.") ¶ 3. Ms. Bosworth adopted the trademark "LOVE WELLNESS" (the "Alleged Mark") because of her own journey of self-love: "sometimes you must 'Love Yourself Well,'" *id.*, and explains that the Alleged Mark has specifically grown to prominence "in the field of health and wellness related to female-focused personal care products." *Id.* at ¶ 4. Ogilvie uses the Alleged Mark as a source of origin for its products, which are sold through retailers like Amazon, Target, Ulta Beauty, and Walmart, as well as through

Ogilvie's website www.lovewellness.com. *Id.* at ¶ 6.

Ogilvie alleges fourteen registrations, including two registrations for the Alleged Mark, as well as registrations for I WELLNESS, LOVE YOURSELF WELL, THE LOVE CLUB, WHOLE LOVE, METABO LOVE, DAILY LOVE, and LOVE WELLNESS THE KILLER. Compl. ¶¶ 13-15; Motion, at 4-5; Declaration of Airina Lynn Rodrigues, ECF No. 14 ("Rodrigues Decl.") Ex. 1. But Ogilve does not evidence how any *other* than the Alleged Mark have generated goodwill as source indicators. *See generally* Bosworth Decl. ¶¶ 3-7, 17 & Exs. 1-4. Rather, through these ancillary "Love"-formative mark registrations with sparse evidence of use, Ogilvie seeks to enlarge its exclusive rights in the term "LOVE." *Id.* ¶ 17 ("Love Wellness has obtained more than a dozen trademarks . . . incorporating the term "LOVE" . . . ."). But Ogilvie does not have exclusive rights in the term "LOVE"; it is by all accounts known to the consuming public as "LOVE WELLNESS." *Id.* ¶¶ 5-16, Exs. 1-4.

### C.  "Love" is widely used in marks by third parties in connection with health and beauty-related goods and services

Though Ogilvie argues that the Alleged Mark is distinctive, Motion, at 8, in reality, the word "love" (the only shared word between the parties' marks) has long been widely used as a source identifier by third parties, including in connection with the exact same types of goods marketed by Ogilvie. A search of live trademark records found hundreds of live registrations in connection with products in the same or similar space as that of Ogilvie, including, among many others, COLLAGEN LOVE; DOVE BODY LOVE; GC LOVE; HANDLOVE; LOVE BOX; LOVE, FAITH; LOVE SPELL; LOVE YOUR BODY; LOVEBUG PROBIOTICS; MAMA LOVE; and YOURLOVE. *See generally* Declaration of Ethan Jacobs submitted herewith ("Jacobs Decl.") ¶¶ 2-18. Many of the products bearing these marks compete with Ogilvie's branded goods in the same retail channels. *Id.* ¶ 12 & Ex. 4. A more comprehensive sampling of

the extensive third-party use of the word "love" as a source indicator, including supporting evidence thereto demonstrating how these competing marks are used in commerce, is set forth in the Jacobs Declaration.

### D.    Ogilvie sues LHI

LHI was not aware of the Alleged Mark, Ogilvie's other marks, or Ogilvie's products when it adopted LOVE and LOVE.COM, and has no intention of trading off Ogilvie's goodwill or associating itself with Ogilvie's brand. Paddie Decl. ¶ 8. LHI first become aware of the Alleged Mark in February 2022, when searching for social media handles, but did not view this as problematic because it considered the two brands to be easy for consumers to distinguish. *Id.* LHI first learned that Ogilvie took issue with its conduct on May 23, 2023, when it received a cease-and-desist letter from Ogilvie's attorneys, asking for a response no later than June 2, 2023. Rodrigues Decl. Ex. 5; *see also* Paddie Decl. ¶ 8. Following back and forth correspondence with LHI's trademark counsel, Ogilvie filed the complaint on June 12, 2023. ECF No. 1.

## <u>LEGAL STANDARD FOR IMPOSING A PRELIMINARY INJUNCTION</u>

Preliminary injunctions require showing (1) "a likelihood of success on the merits . . . or sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly in the plaintiff's favor"; (2) a likelihood of "irreparable injury in the absence of an injunction"; (3) that "the balance of hardships tips in the plaintiff's favor"; and (4) that the "public interest would not be disserved by the issuance of an injunction." *Benihana, Inc. v. Benihana of Tokyo, LLC*, 784 F.3d 887, 895 (2d Cir. 2015) (internal citations and alteration omitted). This standard is demanding: "[I]njunctive relief [is] an extraordinary remedy" that requires "a clear showing that the plaintiff is entitled to such relief." *Salinger v. Colting*, 607 F.3d 68, 79 (2d Cir. 2010) (quoting *Winter v. Nat. Res. Def. Council, Inc.*,

555 U.S. 7, 22 (2008)). Issuing preliminary injunctions requires that "the movant, *by a clear showing*, carries the burden of persuasion." *Woodstock Ventures, LC v. Woodstock Roots LLC*, 837 F. App'x 837, 838 (2d Cir. 2001) (citation omitted, emphasis in original).

## ARGUMENT

## I.     THE PROPOSED RELIEF FAILS TO COMPLY WITH FED. R. CIV. P. 65(d)

At the outset, this Court should deny Ogilvie's Motion because Ogilvie does not identify ***any*** conduct it asks the Court to enjoin. Every injunction must (A) "state the reasons why it issued"; (B) "state its terms ***specifically***"; and (C) "describe ***in reasonable detail*** . . . the act or acts restrained or required." Fed. R. Civ. P. 65(d) (emphasis added). This rule is no "mere technical requirement[]"; rather, because injunctions carry "threat of judicial punishment, basic fairness requires that those enjoined receive explicit notice of precisely what conduct is outlawed." *Purgess v. Parauda*, 2021 WL 2269540, at *5 (S.D.N.Y. June 3, 2021) (citation omitted). Courts routinely refuse to uphold preliminary injunctions where the proposed injunctive relief fails to conform with these requirements.[1]

Here, Ogilvie's proposed injunction is not simply vague—it does not identify ***any*** conduct to enjoin. Instead, it includes a list of factual findings followed by an order for LHI to show cause why Ogilvie "should not be granted a preliminary injunction"—and nothing else. ECF No. 15, at 5. The Motion, if granted, would be a nullity, or, to the extent it is an invitation for the Court to fashion some unspecified relief, it fails to comply with Rule 65(d) and should be denied.

---

[1] *See, e.g., Purgess*, 2021 WL 2269540, at *5; *Dean v. Debejian*, 2022 WL 17842983, at *3 (N.D.N.Y. Dec. 22, 2022) (injunction did not require defendant "to do anything more than that already imposed by law"); *Union Home Mortg. Corp. v. Cromer*, 31 F.4th 356, 364 (6th Cir. 2022) (injunction impermissibly vague and overbroad); *City of New York v. Mickalis Pawn Shop, LLC*, 465 F.3d 114, 146 (2d Cir. 2011) (same); *Howard Opera House Assocs. v. Urban Outfitters, Inc.*, 322 F.3d 125, 129-30 (2d Cir. 2003) (injunction failed to "provide reasonable specificity").

## II.  OGILVIE HAS NOT SHOWN A LIKELIHOOD OF SUCCESS ON THE MERITS

### a.  Ogilvie Has Not Shown a Likelihood of Success on the Merits of its Lanham Act Claims

To prevail under the Lanham Act, Ogilvie must show that its marks are "entitled to protection" and that LHI's use of its own marks is "likely to cause consumers confusion as to the origin or sponsorship of the defendant's goods." *Excelled Sheepskin & Leather Coat Corp. v. Oregon Brewing Co.*, 897 F.3d 413, 417 (2d Cir. 2018). This requires a ***probability of confusion***: "it is not sufficient if confusion is merely possible." *Wizkids/NECA, LLC v. TIII Ventures, LLC*, 2019 WL 1454666, at *4 (S.D.N.Y. Mar. 31, 2019) (quoting *Estee Lauder Inc. v. The Gap, Inc.*, 108 F.3d 1503, 1510 (2d Cir. 1997)). Ogilvie must show that a "large number of purchasers likely will be confused as to the source of the goods in question." *Id.* (citation omitted). Even if Ogilvie's marks are valid and entitled to protection,[2] it has not shown a likelihood of confusion under the eight *Polaroid* factors.[3]

### i.  Ogilvie's Marks are Weak and Entitled to Narrow Protection

The strength of the trademark "refers to its ability to identify the source of the goods being sold under its aegis" and has two components: "its inherent distinctiveness and the distinctiveness it has acquired in the marketplace." *Brennan's, Inc. v. Brennan's Rest., L.L.C.*, 360 F.3d 125, 130-31 (2d Cir. 2004). Although Ogilvie alleges fourteen registrations, "a mark's registered status . . . does not affect the plaintiff's ultimate burden of proof in an infringement action." *Gen. Mills, Inc. v. Kellogg Co.*, 824 F.2d 622, 626 (8th Cir. 1987); *Abercrombie & Fitch*

---

[2] LHI assumes solely for the purpose of this Motion that Ogilvie holds valid and subsisting registrations in each of the marks asserted.

[3] Courts examine the following factors: (1) the strength of the mark; (2) the degree of similarity between the two marks; (3) the proximity of the products; (4) the likelihood that the prior owner will bridge the gap; (5) actual confusion; and (6) the reciprocal of defendant's good faith in adopting its own mark; (7) the quality of defendant's product; and (8) the sophistication of the buyers. *Polaroid Corp. v. Polarad Elecs. Corp.*, 287 F.2d 492, 495 (2d Cir. 1961).

*Co. v. Hunting World, Inc.*, 537 F.2d 4, 12 (2d Cir. 1976) ("When a plaintiff has chosen a mark with some descriptive qualities, he cannot altogether exclude some kinds of competing uses even when the mark is properly on the register."). Notwithstanding its registrations, Ogilvie's marks serve as weak source indicators with little evidence of distinctiveness.

> 1. *Ogilvie's marks are weak because they are in a crowded field of other "Love"-formative marks*

Ogilvie centers its brand around the word "love" and premises its claim on LHI's competing use of the word, but "love" is used as a source indicator by numerous third parties, including in connection with health and wellness supplements and vitamins, beauty and cosmetic products, and other items sold by Ogilvie under its marks. Indeed, as set forth in Jacobs Decl., ¶¶ 8-16 & Ex. 1-4, legion third-party uses of "love" in association with similar classes of products as that of Ogilvie's marks already co-exist in the marketplace, many of which are ***senior*** to Ogilvie.[4] Below are just three examples, among many others:



| LOVE, FAITH, Reg. No. 6,969,692 | COLLAGEN LOVE, Reg. No. 6,111,852 | LOVEBUG PROBIOTICS, Reg. No. 5,523,541 |

This is the natural consequence of using a popular, highly suggestive term, and Ogilvie's

---

[4] Ogilvie's ***own evidence*** illustrates the ubiquity of "LOVE" in connection with similar products. One of the articles Ogilvie seeks to introduce in support of its contention that its products have garnered "editorial recommendations," lists Ogilvie's product alongside a similar product ***that also uses "LOVE" in its branding.*** Bosworth Decl. ¶ 14 & Ex. 4, at 4.

founder concedes that its Alleged Mark and related marks were intentionally chosen to allude to common aspects of wellness: self-love and taking care of oneself. *See* Declaration of Lauren Bosworth, ECF No. 18 ("Bosworth Decl.") ¶ 3. Indeed, two of the other marks Ogilvie claims LHI infringes are LOVE YOURSELF WELL and I LOVE WELLNESS, phrases that make this connection plain. Ogilvie's marks are suggestive at best, but "[a] finding of suggestiveness does not guarantee a determination that the mark is a strong one." *RiseandShine Corp. v. PepsiCo, Inc.*, 41 F.4th 112, 121 (2d Cir. 2022) (citation omitted); *Nora Beverages, Inc. v. Perrier Grp. Amer., Inc.*, 269 F.3d 114, 123 (2d Cir. 2001) ("Even an inherently distinctive mark can, in its commercial context, lack strength as a mark.").

Where, as here, a mark coexists in a crowded field of third-party uses, the strength of a mark is weakened. Extensive third-party use "can dilute the strength of a mark" and third-party use for similar goods is relevant to "showing a crowded field and that the mark is weak." *24 Hour Fitness USA, Inc. v. 24/7 Tribeca Fitness, LLC*, 447 F. Supp. 2d 266, 273 (S.D.N.Y. 2006), *aff'd*, 247 F. App'x 232 (2d Cir. 2007). For this reason, courts consistently reject trademark infringement claims where the mark allegedly infringed is commonly used by third parties. *See, e.g., Jackpocket, Inc. v. Lottomatrix NY LLC*, 2022 WL 17733156, at *32 (S.D.N.Y. Dec. 7, 2022) (widespread use of "jackpot" in lottery and gaming markets "further underlines the weakness of the mark"); *Limited v. Macy's Merch. Grp. Inc.*, 2016 WL 4094913, at *7 (S.D.N.Y. Aug. 2, 2016), *aff'd sub nom. Joules Ltd. v. Macy's Merch. Grp., Inc.*, 695 F. App'x 633 (2d Cir. 2017) (JOULES mark "further weakened by the existence of a number of other trademark registrations and websites that use 'Jules' or a homophone thereof in connection with the sale of women's clothing and accessories"); *Giggle, Inc. v. netFocal Inc.*, 856 F. Supp. 2d 625, 633 (S.D.N.Y. 2012) (third-party use of GIGGLE with children's goods and services

demonstrated mark was weak); *Dana Braun, Inc. v. SML Sport Ltd.*, 2003 WL 22832265, at *10 (S.D.N.Y. Nov. 25, 2003) (clothing brand SARAH ARIZONA not distinctive where "[t]he record shows numerous marks that are registered and in use in the clothing industry that incorporate the name SARAH or SARA"); *Streetwise Maps v. VanDam, Inc.*, 159 F.3d 739, 744 (2d Cir. 1998) ("[T]hird party use of the words 'street' and 'wise' weakens the strength of Streetwise's mark"); *Lang v. Retirement Living Publ'g Co.*, 949 F.2d 576, 581 (2d Cir.1991) (extensive use of "Choice" and "Choices" weighed against finding that NEW CHOICES was strong)*; Plus Prods. v. Plus Disc. Foods, Inc.*, 722 F.2d 999, 1006 (2d Cir. 1983) (when a mark is "comprised of an undistinctive word and coexisting with extensive third-party usage – it is extremely unlikely that prudent consumers will confuse it with similar marks on non-competitive goods"); *Beech-Nut, Inc. v. Warner-Lambert Co.*, 346 F. Supp. 547, 549 (S.D.N.Y. 1972), *aff'd*, 480 F.2d 801 (2d Cir. 1973) (BREATH SAVERS did not infringe BREATH PLEASERS where "breath" extremely common among candies and mints).

Only last year, the Second Circuit in *RiseandShine* vacated a preliminary injunction and reversed the district court's finding that "Rise," used in connection with a caffeinated beverage, was strong. 41 F.4th at 121. Relevant here, the Second Circuit highlighted that "Rise" was naturally associated with consuming caffeine and the morning, as illustrated by the over 100 other uses in connection with "coffee, tea, bottled beverages, energy drinks, soft drinks, drinkable health supplements, cafes, yogurts, and granolas," and was therefore a weak mark, entitled to only an "extremely narrow scope" of protection. *Id.* at 122-24. Like here, the plaintiff's mark drew "on a common association with the word in its mark." *Id.* at 122-23 (others ""used 'Rise' in the same way as plaintiff did—to allude to increased energy, particularly in the morning hours"). Here, "Love" and "Wellness" are naturally associated with the wellness

products Ogilvie sells, as Ms. Bosworth admits. Bosworth Decl. ¶ 3. The only commonality with LHI's marks—the word "love"—is shared by countless others.

> ### 2. Ogilvie has not shown that its marks have acquired distinctiveness in the marketplace.

Courts in the Second Circuit analyze acquired distinctiveness in the marketplace by considering six factors: "advertising expenditures, consumer studies linking the mark to a source, unsolicited media coverage of the product, sales success, attempts to plagiarize the mark, and the length and exclusivity of the mark's use." *Car-Freshner Corp. v. Am. Covers, LLC*, 980 F.3d 314, 329 (2d Cir. 2020). Ogilvie's evidence on these factors is scant.

As a threshold matter, Ogilvie does not even allege, let alone evidence, that it uses most of the registered marks identified in the Complaint or how the marks are used. Other than "LOVE WELLNESS," and "LOVE YOURSELF WELL," identified in screenshots provided by Ogilvie, (Bosworth Decl. Ex. 1), Ogilvie does not explain how its other registered marks (e.g. "I LOVE WELLNESS," WHOLE LOVE," "METABO LOVE," "THE LOVE CLUB," etc.) are even relevant to this case, or why LHI's marks create a likelihood of confusion.[5]

And for the Alleged Mark, "LOVE WELLNESS," the Motion offers no evidence that the mark, in use for only a few years, creates a consumer impression distinct from the sea of other "Love"-formative brands. *See Two Hands IP LLC v. Two Hands Am., Inc.*, 563 F. Supp. 3d 290, 303 (S.D.N.Y. 2021) ("[P]laintiff has not used the mark for a sufficiently long time, and its use

---

[5] These marks are also in entirely different classes of goods and services from the those offered by LHI, further obscuring whether Ogilvie is even alleging infringement as to them. Instead, Ogilvie appears to be bootstrapping its claimed exclusive rights in the stand-alone word "love" to a number of registrations for ancillary "love"-formative marks for which Ogilvie has not even demonstrated use by claiming it as the "dominant word" in its marks. Motion, at 11. But Ogilvie's "isolation of a single, common word" only serves to further "sap[] the strength" of its marks. *See Giggle*, 856 F. Supp. 2d at 632.

has not been sufficiently exclusive.").[6] Ogilvie offers no brand recognition surveys, instead

resting on purportedly selling "more than $100 million USD" since 2021, Motion, at 3. But this

is a drop in the bucket, considering that the combined market for vitamins, supplements, and

beauty and skincare products like those offered by Ogilvie is many billions of dollars.[7] Ogilvie

also claims that its products "garner extensive editorial recommendations," Motion, at 3, but

offers no evidence that it did not solicit that media coverage. *See Christian Louboutin S.A. v.*

*Yves Saint Laurent Am. Holdings, Inc*., 696 F.3d 206, 226 (2d Cir. 2012).[8] Ogilvie also notes that

its social media accounts have accumulated "hundreds of thousands of followers," but again fails

to show that they are unsolicited. Indeed, followers on social media can be bought, and a high

number associated with a brand's social media account is more indicative of ad spending than

consumer awareness. *See* Jon Stojan, *The Ins and Outs of Buying Instagram Followers and*

*Likes*, Miami Herald (Feb. 21, 2023), *available at* https://amp.miamiherald.com/contributor-

content/article272564875.html.

     Ogilvie's evidence shows, at most, that it has invested in advertising, but "[s]imply

---

[6] Ogilvie's failure to even address the "crowded field" issue in its moving brief is puzzling in light of the fact that the pre-Motion correspondence from LHI's counsel extensively focused on that issue. Jacobs Decl. ¶ 17. After Ogilvie's counsel notified LHI's counsel of its anticipated Motion, LHI's counsel asked Ogilvie's counsel whether Ogilvie had co-existence agreements with any of the numerous other third-party users, but Ogilvie's counsel was not aware of any. *Id*.

[7] According to a recent market research study published on Yahoo! Finance, the global health supplements market was valued at $140.3 billion in 2022. *See* Contrive Datum Insights, *Health Supplement Market Is Expected to Reach USD 620.8 Billion by 2030, Grow at a CAGR Of 8.6% during Forecast Period 2023 to 2030*, Yahoo! Finance (Apr. 7, 2023), *available at* https://finance.yahoo.com/news/health-supplement-market-expected-reach-040000637.html. Other studies have concluded that the United States supplement market size in 2022 was valued at $50.91 billion with a projected compound annual growth rate of 5.7% through 2030. *See* U.S. Dietary Supplements Market Size, Share & Trends Analysis Report, 2023-30, *available at* https://www.grandviewresearch.com/industry-analysis/us-dietary-supplements-market-report.

[8] *See also Bobcar Media, LLC v. Aardvark Event Logistics*, 554 F. Supp. 3d 606, 618 (S.D.N.Y. 2021) (rejecting press articles because plaintiff did not meet its burden to show they were unsolicited); *cf. Nat'l Distillers Prods. Co. v. Refreshment Brands, Inc.*, 198 F. Supp. 2d 474, 481 (S.D.N.Y. 2002) (evidence of media coverage did not favor plaintiff where solicited); *c.f.*, *Giggle*, 856 F. Supp. 2d at 632 ("[S]imply because a reporter knows [plaintiff's mark] does not mean that the reporter's audience, or the consuming public, does as well.").

showing that a certain amount was spent on advertising provides little support for secondary meaning absent some demonstration that the advertisements caused consumers to associate the mark with [Plaintiff]." *Easy Spirit, LLC v. Skechers U.S.A., Inc.*, 571 F. Supp. 3d 185, 203-05 (S.D.N.Y. Nov. 16, 2021); *see also Jackpocket*, 2022 WL 17733156, at *34 (same).

Even for that ad spend, Ogilvie has not shown how its actions relate to consumer recognition, and for which of Ogilvie's fourteen registered marks. That is, Ogilvie provides evidence of sales, advertising, and social media followers for the company *as a whole*, and not related to any of its *specific marks*. *See Easy Spirit*, 571 F. Supp. 3d at 201 (acquired distinctiveness refers to "recognition ***plaintiff's mark*** has earned in the marketplace") (emphasis added); *Jackpocket*, 2022 WL 17733156, at *34 (citation omitted). Finally, given that Ogilvie only uses the word "love" in conjunction with one or more words, there is no evidence whatsoever to even suggest that consumers associate the stand-alone word with Ogilvie. Ogilvie's marks are therefore weak, diluted by a crowded field of other "Love"-formative marks with little evidence of acquired distinctiveness.

> ii.  <u>Ogilvie and LHI's Marks Give Markedly Different Commercial Impressions</u>

Ogilvie acknowledges that it cannot monopolize the commonly-used word "love," Motion, at 24, yet ***does not demonstrate any other similarities between the parties' marks***. In fact, Ogilvie's Motion lacks any description of how the parties' marks overlap *other* than this shared word. *See Wizkids/NECA*, 2019 WL 1454666, at *8 ("Although 'at first blush, the use of the same word appears to weigh . . . in favor of similarity, the use of the same words is far from dispositive.'"); *RiseandShine*, 41 F.4th at 124-25 (shared use of term "Rise" in large bold letters

not probative because "the word 'Rise' in this context is not distinctive.").[9]

Marks should be considered "sequentially in the context of the marketplace," and side-by-side comparisons should be given less weight. *See, e.g., Louis Vuitton Malletier v. Dooney & Bourke, Inc.*, 454 F.3d 108, 117 (2d Cir. 2006) (citation omitted)); *Nabisco, Inc. v. Warner-Lambert Co.*, 220 F.3d 43, 47 (2d Cir. 2000) ("Our inquiry does not end with a comparison of the marks themselves. Rather, in determining whether two marks are confusingly similar, ***we must appraise the overall impression created by the context in which they are found*** and consider the totality of factors that could cause confusion among prospective purchasers.") (emphasis added). Here, the parties' marks give completely different commercial impressions in the marketplace. *See, e.g., Fed. Express Corp. v. Fed. Espresso, Inc.*, 201 F.3d 168, 172 (2d Cir. 2000) (FEDERAL ESPRESSO and FEDERAL EXPRESS "somewhat similar in content and sound" but "those similarities are far outweighed by the dissimilarities evident in the parties' use of the marks"); *Jackpocket*, 2022 WL 17733156, at *40 ("Analyzing the two logos in context there is a low likelihood of confusion between the source of the two products. Both parties use rounded fonts, but the similarities begin and end there."). Even a cursory look at the parties' respective uses of "LOVE" demonstrates that they are easily distinguishable:

     

Bosworth Decl. Exs. 1, 6. The differences are further summarized below:

---

[9] Recognizing the lack of similarities, Ogilvie tries to enlarge its claims by arguing that LHI "closely associates" its marks with the word "wellness" in describing its services. But as Plaintiff acknowledges, LHI is not using "wellness" ***as a mark***. Ogilvie itself recognized that "wellness" is a common descriptor when it disclaimed any exclusive right to use the word "wellness" apart from the full mark, LOVE WELLNESS, in its trademark applications. Rodrigues Decl, ¶ 2 & Ex. 1. Ogilvie furthermore argues without basis that LHI operates "under the trademark and/or trade name 'Love Health,' which has a meaning identical to "Love Wellness," Motion, at 24, but there is no evidence LHI uses "Love Health" as a source indicator in commerce, as opposed to a legal entity name. In fact, LHI intends to change its legal name to Love.com, Inc. Paddle Decl. ¶ 6.

| Ogilvie's "LOVE WELLNESS" | LHI's "LOVE" |
|---|---|
| "LOVE" is positioned in conjunction with "WELLNESS" | "LOVE" sits alone, apart from any other word |
| "LOVE" is in one color and font—the same as "WELLNESS"—and Ogilvie calls attention to the letter "V" on social media giving it a prominence distinct from the other letters in its branding:<br><br><br><br>*See* Bosworth Decl. Ex. 3. | "LOVE" calls attention to the "O," imbuing it with a different character that is distinct from the other letters, giving it a solid red hue surrounded by a thin outline in its branding:<br><br><br><br>*See* Paddie Decl. ¶ 14. |
| "LOVE WELLNESS" appears on all of Ogilvie's products, creating an association between the brand and the product offerings themselves. | "LOVE" is not used as a source indicator for any competing product offerings on LHI's website, but merely serves as the brand of the online marketplace. *See infra*, Section II.a.iii. |

These differences are even more striking in the context of the parties' respective websites, which share little to no similarity aside from having online product listings. *See Jackpocket*, 2022 WL 17733156, at *41 ("There is little about the appearance of the two [websites] that would suggest to a consumer that they come from the same course.") (citations omitted).

     iii.  <u>Ogilvie and LHI Offer Very Different Goods and Services</u>

"The fact that two products are in the same general field does not by itself mean that they are in competitive proximity." *Swanson v. Georgetown Collection*, 1995 WL 72717, at *12 (N.D.N.Y. Feb. 14, 1995); *Sunenblick v. Harrell*, *aff'd* 101 F.3d 684 (2d Cir. 1996) (proximity of products factor favored defendant, notwithstanding that the parties both used their mark on musical products sold in the same retail outlets, cities, and format). Here, Ogilvie has, at most, demonstrated that the parties' goods and services appear to be in the same general field. But the

evidence shows that the goods and services have more far more differences than similarities.

First, Ogilvie's argument that the parties' "respective goods and services are identical," Motion, at 13, is belied by its own explanation that LHI "merely function[s] as a drop shipper for third party products," *Id.* at 24, n.8. Even a cursory glance of the product listings on LHI's website, *see* Paddie Decl. ¶¶ 9-13, 15 & Ex. 1, demonstrates that the listings for goods being offered by LHI ***do not bear LHI's marks***. They bear the completely different marks of third parties, which could not possibly be confused for Ogilvie's marks.

Unlike Ogilvie, LHI positions the LOVE and LOVE.COM brands to denote its online marketplace, not the products. LHI is not selling its own branded health goods, either on its own website or at brick-and-mortar retailers such as those where Ogilvie claims its branded goods are sold, *see* Motion, at 3, and thus does not compete with Ogilvie in these retail channels. Thus, there is no likelihood that a consumer would confuse Ogilvie's products for those of LHI—there are no competing LHI products in the first place. Because the products being sold by LHI ***do not display LHI's marks***, it is immaterial that some of the product categories might overlap with Ogilvie's own branded products. *See Giggle*, 856 F. Supp. 2d at 635 ("While both parties operate in the children's goods industry, they service different markets within the industry . . . ."). No reasonably prudent consumer would be confused as to the source of origin. For example:

BODYBIO Gut+, sold on LHI's site:                    LOVE WELLNESS Gut Feelings Probiotics,
                                                      sold on Ogilvie's site:




*See* Paddie Decl. ¶ 10.[10]

Limiting the analysis to the parties' respective online retail services does not change this outcome. Where Ogilvie launched its website as an online store to sell goods branded with the Alleged Mark, Bosworth Decl. ¶ 3, LHI launched its own online marketplace to focus on wellness and connectedness far more broadly, listing curated and vetted third-party branded products across a much broader spectrum of goods. Paddie Decl. ¶¶ 10, 16. This includes, *e.g.*, a "Grocery" section for natural and healthy foods, and a "Sports & Wearable" section for sports beverages and apparel, and is being broadened even further to include things like home goods and sustainably manufactured products. *Id.* Moreover, in line with LHI's core message of interconnectedness, LHI envisions creating not just a marketplace, but a social community where people can connect over their healthcare experiences and healing journeys, and recommend products to each other, further setting itself apart from Ogilvie. Paddie Decl. ¶ 6. LHI's online marketplace is thus a completely different model from Ogilvie's own online store, which simply serves as a retail outlet for Ogilvie's own goods under the Alleged Mark, further contributing to the parties' markedly different commercial impressions.

    iv.  <u>Ogilvie Offers No Evidence of Bridging the Gap</u>

Based on the false assumption that Ogilvie and LHI's products are in competitive proximity, Ogilvie offers no argument as to the risk of bridging the gap, instead taking the position that there is "no gap to bridge," Motion, at 9, apparently abandoning any notion that this factor weighs in Ogilvie's favor for purposes of its Motion.

---

[10] To be sure, LHI does sell some products of its own bearing the LOVE mark, but these are "swag"— clothing apparel and a book to promote brand awareness. Paddie Decl. ¶ 14. These are nothing like the products Ogilvie offers, and further serve to distinguish the parties' marks.

v.   Ogilvie Admits There is No Actual Confusion

Ogilvie does not even discuss actual confusion, effectively acknowledging that there is none. Instead, it argues in a footnote that evidence of actual confusion is not required to prevail under the Lanham Act. Motion, at 8 n.4. But courts in the Second Circuit have explained that evidence of actual confusion is nevertheless "highly probative" of likelihood of confusion. *See, e.g., Sunenblick*, 895 F. Supp. at 630; *Medici Classics Prods. LLC v. Medici Grp. LLC*, 590 F. Supp. 2d 548, 556 (S.D.N.Y. 2008); *Giggle*, 856 F. Supp. 2d at 636 ("Without proof that Defendant's use of a mark has actually caused confusion, there is less chance that it likely will in the future."). "Proof of actual confusion is generally shown through consumer surveys or anecdotal evidence of confusion." *Medici*, 590 F. Supp. 2d at 556. Here, Ogilvie does not identify even a single instance in which a consumer was actually confused by LHI's use of LOVE or LOVE.COM. It is telling that, despite purportedly having 65,000 customer reviews on its website and hundreds of thousands of followers on social media, Motion, at 3, Ogilvie did not receive a single communication from any one of them about any confusion. Nor has Ogilvie put forward any survey evidence. Such a glaring omission is itself "evidence that actual confusion cannot be shown." *Reply All Corp. v. Gimlet Media, LLC*, 843 F. App'x 392, 397 (2d Cir. 2021) (citation omitted); *Essence Comm'ns, Inc. v. Singh Indus.*, 703 F. Supp. 261, 269 (S.D.N.Y. 1988) (citing cases).

vi.   LHI Adopted its Marks in Good Faith

LHI has asserted, under oath, that it adopted its marks without any reference to Ogilvie's marks, and in fact was not even aware of Ogilvie's marks until last year. Paddie Decl. ¶ 8. Rather, LHI saw an opportunity to purchase the valuable "love.com" domain name, and built its company around the concept of "love" to denote connectedness and trust. Paddie Decl. ¶ 6. There was simply no intent to trade off Ogilvie's goodwill or copy its marks, and Ogilvie

18

presents no evidence to the contrary. Instead, Ogilvie argues that LHI had "constructive notice" of its "prior rights" in its marks, and speculates that LHI "likely had actual knowledge" of its marks, based solely on self-serving statements about its so-called "extensive promotion." But this is not evidence of bad faith. *See, e.g., Star Indus. v. Bacardi & Co.*, 412 F.3d 373, 388-89 (2d Cir. 2005) (though "[b]ad faith may be inferred from the junior user's actual or constructive knowledge of the senior user's mark," "in the absence of additional evidence indicating an intent to promote confusion or exploit good will or reputation, this Court has found the junior user to be in good faith"). And neither are LHI's purported actions in response to Ogilvie sending a demand letter, Motion, at 14. *See Medici*, 590 F. Supp. 2d at 556-57 ("it has long been held that '[d]efendant[']s persistence in their use of the design after notice proves little or nothing against them.'"). Ogilvie argues that after it filed its Complaint, LHI purchased search engine keywords like "love" and "love supplements" to purportedly capitalize on Ogilvie's business, Motion at 14, but such conduct, even if true, does not show a specific intent to trade off Ogilvie's goodwill, particularly given Ogilvie's own recognition that it cannot "monopolize the term 'love,'" Motion, at 24, and the clear record that myriad others use "love" in connection with the same classes of goods and services. Jacobs Decl. ¶¶ 7-16.  In fact, a Google search for "love supplements" shows numerous other "sponsored" products having nothing to do with either party, demonstrating that the phrase is heavily adopted by third parties seeking to promote search results. *Id*. ¶ 18. This factor also weighs against a likelihood of confusion.[11]

---

[11] Ogilvie cites a number of cases that merely confirm "actual or constructive knowledge of a senior user's mark," by itself, does not evidence bad faith. *See, e.g. Paddington Corp. v. Attiki Importers & Distribs., Inc.*, 996 F.2d 577, 587 (2d Cir. 1993) (bad faith where defendant referenced plaintiff's trade dress to create its own design); *Mobil Oil Corp. v. Pegasus Petroleum Corp.*, 818 F.2d 254, 258-59 (2d Cir. 1987) (bad faith where defendant knowingly referenced plaintiff's distinctive mark); *Pfizer v. Sachs*, 652 F. Supp. 2d 512, 524 (S.D.N.Y. 2009) (bad faith where defendant previously visited plaintiff's headquarters and refused to comply with "multiple" cease-and-desist letters). None of Ogilvie's cases involved a finding of bad faith where a junior user, without actual knowledge of the senior user's mark, adopted a common word widely used as a mark by countless other third parties.

vii.   <u>The Respective Quality of the Parties' Goods and Services Does Not Favor a
Finding of Infringement</u>

Ogilvie offers hearsay articles without foundation in a misguided attempt to impugn

LHI's founder and characterize the company as providing low-quality goods and services. But its

personal attacks are neither accurate nor relevant to the *Polaroid* analysis. *See* Paddie Decl. ¶ 5.

As to the service itself, Ogilvie offers little to suggest LHI's services are of a markedly lower

quality than that of its own, relying on sparse anecdotal evidence. And even taking Ogilvie's

argument at face value, such a difference in quality would ***disfavor*** a finding of likelihood of

confusion. *See Wizkids/NECA,* 2019 WL 1454666, at \*13 (S.D.N.Y. Mar. 31, 2019) ("The

Second Circuit has explained that '[a] marked difference in quality . . . actually tends to reduce

the likelihood of confusion in the first instance, because buyers will be less likely to assume that

the senior user whose product is high-quality will have produced the lesser-quality products of

the junior user.'") (quoting *Savin Corp. v. Savin Grp.*, 391 F.3d 439, 461 (2d Cir. 2004)). While

Ogilvie takes great pains to differentiate the consumer experience on the parties' websites, it fails

to explain how those purported differences ***support*** a likelihood of confusion.

viii.   <u>Consumers in the Relevant Markets can Tell the Difference</u>

Ogilvie's argument that the low price of some products offered by both parties would

lead to a higher likelihood of confusion, Motion, at 16, rests on the false premise that LHI is

selling competing products under its own brand. This argument is wrong—see *supra* Section

II.a.iii—and is inconsistent with Ogilvie's characterization of LHI as "merely a drop shipper for

third party products." Motion, at 24 n.8. It therefore is irrelevant that the parties may be offering

similar products at similar price points because the relevant products on LHI's website ***do not***

***bear LHI's marks***. *See supra*, Section II.a.iii. No consumer, even one of modest sophistication,

could confuse the products being sold through LHI's website with the products sold by Ogilvie,

whether on the parties' websites or through the retail channels Ogilvie claims it uses, because there is nothing that would remotely indicate an affiliation.[12]

### b. Ogilvie's State Law Claims Are Unlikely to Succeed

Because the evidence does not show that LHI infringed Ogilvie's trademarks or engaged in unfair competition, it also does not support Ogilvie's claims under New York law. But on top of that, Ogilvie cannot meet the elements for these claims.

#### i.  General Business Law § 349

Far from establishing LHI's liability under GBL § 349, Ogilvie *admits* that its claims fall entirely outside the scope of that statute. To sustain a claim under GBL § 349, a plaintiff must "plausibly allege harm to consumers *beyond* trademark confusion and unfair competition." *Blockchain Lux. S.A. v. Paymium*, 2019 WL 4199902, at *11 (S.D.N.Y. Aug. 7, 2019) (emphasis added). This is because "ordinary trademark disputes" are outside the scope of GBL § 349. *See Kaplan, Inc. v. Yun*, 16 F. Supp. 3d 341, 352 (S.D.N.Y. 2014); *Wizkids/NECA*, 2019 WL 1454666, at *15 ("[I]t is well settled . . . that trademark . . . infringement claims are not cognizable under [GBL § 349] unless there is a specific and substantial injury to the public interest over and above ordinary trademark infringement or dilution.").

Here, Ogilvie admits that it cannot demonstrate harm beyond its alleged trademark infringement and unfair competition claims, simply arguing, contrary to established law, that the "same facts that support a likelihood of success on Love Wellness's Lanham Act trademark infringement, false designation, and unfair competition claims also support a likelihood of

---

[12] It is furthermore immaterial whether a consumer searching for Ogilvie's products may also discover LHI's website. *See Playtex Prods. v. Georgia-Pacific Corp.*, 390 F.3d 158, 166 (2d Cir. 2004) (confusion of a search engine in distinguishing between similar marks does not amount to consumer confusion); *c.f. Savin Corp*, 391 F.3d at 462 n.13 (initial interest confusion over the internet requires "a showing of intentional deception" because "consumers diverted on the Internet can more readily get back on track").

success on Love Wellness' G.B.L. § 349 claims." Motion, at 17. Accordingly, even if Ogilvie could demonstrate a likelihood of success under the Lanham Act, its claim under GBL § 349 would still fail.

ii. General Business Law § 360-l

A claim under GBL § 360-l requires showing (1) ownership of a distinctive mark, and (2) a likelihood of dilution. *Easy Spirit*, 515 F. Supp. 3d at 76. As a threshold matter, while a mark need not be famous to qualify for protection under GBL § 360-l, courts have explained that a plaintiff still must be able to show that its mark is "extremely strong." *See, e.g., ESPN, Inc. v. Quiksilver, Inc.*, 586 F. Supp. 2d 219, 228 (S.D.N.Y. 2008) (citing cases); *New World Sols., Inc. v. NameMedia Inc.*, 150 F. Supp. 3d 287, 328 (S.D.N.Y. 2015) (under section 360-l, the plaintiff's mark "must be an extremely strong mark either because of its inherently distinctive qualities or the fact that it has acquired secondary meaning."). Furthermore, "New York law does not permit a dilution claim unless the marks are "similar enough that a substantial segment of the target group of customers sees the two marks as essentially the same." *Easy Spirit*, 515 F. Supp. 3d at 77.

As explained above, Ogilvie's marks are far from "extremely strong," and their only similarity to LHI's marks is the common use of "love"—used by countless others. *See supra* Section II.a.i-ii. Ogilvie thus does not even qualify for protection under GBL § 360-l, and even if it did, it would not be able to demonstrate a likelihood of dilution under New York law.

iii. General Business Law § 133

Liability under Section 133 requires that a plaintiff show "(1) intent to deceive the public, and (2) the assumption, adoption, or use of a corporate, assumed, or trade name of another." *Caliko, SA v. Finn & Emma, LLC*, 2022 WL 596072, at *13 (S.D.N.Y. Feb. 28, 2022).  The intent element is particularly important. *See Perfect Pearl Co. v. Majestic Pearl & Stone, Inc.*,

22

887 F. Supp. 2d 519, 542 (S.D.N.Y. 2012) ("intent to deceive the public" is "indispensable" to GBL § 133 claim) (citation omitted). *See also Frank's Rest., Inc. v. Lauramar Enters.*, 711 N.Y.S.2d 433, 435 (2d Dep't 2000) (adoption of "similar name, without any evidence of intention, deception, or damage, is an insufficient ground for summary relief under [Section 133]"). As previously set forth in Section II.a.vi., Ogilvie has not produced any evidence that LHI intentionally set out to deceive the public.

## III.   OTHER FACTORS WARRANT DENIAL OF INJUNCTIVE RELIEF

### a.   Ogilvie Has Not Demonstrated Irreparable Harm

"To demonstrate irreparable harm, the movant must show 'an injury that is neither remote nor speculative, but actual and imminent." *Engine Capital Mgmt., LP v. Engine No. 1 GP LLC*, 2021 WL 1372658, at *4 (S.D.N.Y. Apr. 12, 2021) (citation omitted). And Courts in the Second Circuit routinely find that preliminary injunctions are unwarranted due to the moving party's delay in seeking them. "There is no bright-line rule for how much delay is too much, but courts in this Circuit typically decline to grant preliminary injunctions in the face of unexplained delays of more than two months*." Coscarelli v. ESquared Hosp. LLC*, 364 F. Supp. 3d 207, 222 (S.D.N.Y. 2019) (internal quotations and citations omitted) (collecting cases); *accord Weight Watchers Int'l, Inc. v. Luigino's, Inc.*, 423 F.3d 137, 144 (2d Cir. 2005) ("delays of as little as ten weeks" can "defeat the presumption of irreparable harm"); *Citibank, N.A. v. Citytrust*, 756 F.2d 273, 276–77 (2d Cir. 1985) (ten-week delay rebutted claim of irreparable injury).

Here, Ogilvie was aware of the alleged infringement no later than May 2, Motion, at 5, yet waited over a month later, until June 12, 2023, to bring this lawsuit, and almost another month, until July 5, 2023, to bring this Motion. In all, Ogilvie waited almost **ten weeks** to seek injunctive relief, and even then, failed to identify what injunctive relief it even seeks. That— combined with Ogilvie's failure to demonstrate with any specificity the harm to it if LHI's

conduct is not enjoined—counsels against a finding of irreparable harm.

### b. The Balance of Hardships Weighs Heavily in LHI's Favor

Because Ogilvie's motion does not identify any conduct for the Court to prohibit, *see supra*, Section I, LHI and the Court cannot meaningfully assess balance of hardships. It should therefore be impossible for the Court to determine whether this factor weighs one way or another based on unidentified injunctive relief. But any injunctive relief against LHI here would appear to impose greater hardship on LHI for the reasons that follow.

<u>First</u>, there is little risk that LHI's use of its marks will cause a likelihood of confusion. *Supra*, section II.a. Ogilvie provides no evidence of harm to date, resting instead on speculation.

<u>Second</u>, although Ogilvie contends that an injunction has little risk for LHI because it is relatively new, Motion, at 24, it ignores that LHI is an emerging start-up that is just starting to gain momentum. An injunction could be an existential threat to any startup in LHI's position, but the harm is particularly concrete here, where LHI acquired its domain name at a substantial cost, and invested years developing its brand around the concept of "love" before publicly launching the company earlier this year. Paddie Decl. ¶ 21. LHI is furthermore in the midst of raising investment funding, which is essential to any startup in its position, and an injunction could quash LHI's ability to raise capital, effectively endangering the company's existence. *Id.* An injunction here, particularly where Ogilvie has made no effort to narrow its scope or even apprise LHI of its terms, would be exceedingly harsh and oppressive. *See Ivy Mar Co. v. C.R. Seasons*, 907 F. Supp. 547, 567 (E.D.N.Y. 1995) (denying preliminary injunction that would have prevented defendant from carrying on its business) (citing *Walter Karl, Inc. v. Wood*, 528 N.Y.S.2d 94, 99 (2d Dep't 1988) ("The loss of an individual's livelihood should not be so easily jeopardized.")).

## IV.    IN THE ALTERNATIVE, A SIZABLE BOND IS WARRANTED

The court may issue a preliminary injunction "only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c). Here, should the Court be inclined to order an injunction, any bond should be significant given the existential risk to LHI's business. Indeed, LHI is likely to incur significant damages if an injunction is ordered. Paddie Decl. ¶ 21. Furthermore, the extent of such damages cannot even be fully comprehended due to the ambiguity of Ogilvie's proposed injunction, further supporting a higher bond. *Interlink Int'l Fin. Servs., Inc. v. Block*, 145 F. Supp. 2d 312, 318 (S.D.N.Y. 2001) ("In setting the amount of security for a preliminary injunction, the trial court should err on the high side, since an error on the low side may produce irreparable injury, because damages for an erroneous preliminary injunction may not exceed the amount of the bond.")  (quotations and citation omitted).

## <u>CONCLUSION</u>

In light of the foregoing, LHI respectfully requests the Motion be denied in its entirety.

Dated: July 20, 2023.

Respectfully submitted,

*/s/ Leo M. Lichtman*
Leo M. Lichtman
ONE LLP
23 Corporate Plaza, Suite 150
Newport Beach, California 92660
Tel. (949) 502-2870
llichtman@onellp.com

*/s/ Ethan Jacobs*
Ethan Jacobs
ETHAN JACOBS LAW CORPORATION
100 Pine Street, Suite 1250
San Francisco, California 94111
Tel. (415) 275-0845
ethan@ejacobslaw.com

*/s/ James M. Slater*
James M. Slater (admitted *pro hac vice*)
SLATER LEGAL PLLC
113 S. Monroe Street
Tallahassee, Florida 32301
Tel. (305) 523-9023
james@slater.legal

*Counsel for Defendant Love Health, Inc.*